1    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
2
- - - - - - - - - - - - - X
3
UNITED STATES OF AMERICA,      : 20CR371(AMD)
4                              :
          Plaintiff,           :
5                              :
          -against-           : United States Courthouse
6                              : Brooklyn, New York
VLADIMIR GEYKHMAN,             :
7                              :
          Defendant.           : Tuesday, April 12, 2022
8                              : 11:00 a.m.
                               :
9                              :
                               :
10
- - - - - - - - - - - - - X
11
          TRANSCRIPT OF CRIMINAL CAUSE FOR SENTENCING
12           BEFORE THE HONORABLE ANN M. DONNELLY
             UNITED STATES DISTRICT JUDGE
13
              A P P E A R A N C E S:
14
For the Government: UNITED STATES ATTORNEY'S OFFICE
15                  Eastern District of New York
                    271 Cadman Plaza East
16                  Brooklyn, New York 11201
               BY:  MIRIAM GLASER DAUERMANN, ESQ.
17                  Assistant United States Attorney

18  For the Defendant:   LAW OFFICE OF DONNA R. NEWMAN
                    20 Vesey Street, Suite 400
19                  New York, NY 10007
                    BY: DONNA R. NEWMAN, ESQ.
20

21  Probation Department:  Jennifer Baumann

22  Court Reporter:   SOPHIE NOLAN
                    225 Cadman Plaza East/Brooklyn, NY 11201
23                  NolanEDNY@aol.com
    Proceedings recorded by mechanical stenography, transcript
24  produced by Computer-Aided Transcription

25

1                    (In open court.)

2              (The Hon. Ann M. Donnelly, presiding.)

3                   (Defendant present.)

4         THE COURTROOM DEPUTY:  This is criminal cause for a

5    sentencing docket number 20-CR-371, *USA versus Vladimir*

6    *Geykhman.*

7              Counsel, state your appearance.  Government first.

8         MS. GLASER DAUERMANN:  Miriam Glaser Dauermann for

9    the United States and I am joined by Probation Officer,

10   Jennifer Baumann.  Good morning, Your Honor.

11        THE COURT:  Good morning.

12        MS. NEWMAN:  Good morning, Your Honor.  Donna Newman

13   on behalf of Vladimir Geykhman, who is seated next to me, and

14   also in the audience is his wife.  Thank you very much.  I'm

15   sorry, his ex-wife.  She already corrected me.

16        THE COURT:  That's okay.  Good afternoon.

17             This is a sentencing proceeding and Mr. Geykhman

18   pled guilty before me to the first count of a two count

19   indictment.  The first count charges that between March of

20   2019 and January of 2020 -- is it Mr. Geykhman, is that what

21   it is?

22        THE DEFENDANT:  Geykhman.

23        THE COURT:  Geykhman, okay.  That he conspired with

24   other people to execute a scheme to defraud various no-fault

25   insurers, who included Insurer Number One, and the insurers

1  were healthcare benefit programs as defined by statute and

2  that the conspiracy that he conspired to obtain money and

3  property owned by the no-fault insurers by false and

4  fraudulent pretenses and representations.  That's, in general

5  terms, what he pleaded guilty to.

6          I just want to say at the outset, this question of

7  restitution is not something that we're going to resolve today

8  and so we will address the questions that I have about it at

9  the end, but I know Mr. Geykhman has been anxious about this

10  proceeding so I would like to move to that portion of it and

11  that's understandable too.  I just don't want to spend a whole

12  lot of time on that.  We can talk about it at the end.

13          So I'm going to go over the things that I reviewed

14  in connection with today's proceeding, the presentence

15  investigation report as well as the sentence recommendation

16  which I think both sides have; is that correct?

17          MS. GLASER DAUERMANN:  Yes, Your Honor.

18          MS. NEWMAN:  Yes, Your Honor.

19          THE COURT:  Okay.  There have been a number of --

20  there's also an addendum to the pre-sentence report from -- I

21  think from yesterday.  There is also -- I have reviewed the

22  sentencing recommendation as well as all the exhibits that the

23  defense submitted on March 10th.  There is also -- Ms. Newman

24  also submitted another letter on March 16th.  The Government

25  submitted a sentencing memorandum and there's another letter

1  from the defense from March 20th, another sentencing

2  supplement on April 7th and another submission from Ms. Newman

3  on April 10th and, as I said, an addendum to the pre-sentence

4  report.  I think I got it all.

5          Am I missing anything?  No?

6          MS. GLASER DAUERMANN:  I think that's correct, Your

7  Honor.

8          THE COURT:  All right.  Aside from this restitution

9  question, is anybody seeking an evidentiary hearing on any

10 issue?

11         MS. GLASER DAUERMANN:  No, Your Honor.

12         MS. NEWMAN:  Well, Your Honor, I guess it has to do

13 with the Court's rulings with respect to role.  At this point

14 now, we believe we're very secure in our submissions and that

15 no additional testimony would be needed, but --

16         THE COURT:  So let's see what happens.

17         MS. NEWMAN:  Thank you, Your Honor, well said.

18         THE COURT:  I'm just going to go over the -- I mean,

19 spoiler alert, I'm not applying that the manager -- I think

20 everybody agrees that that does not apply.  It was not in the

21 plea agreement and it doesn't seem to be appropriate.

22         I mean, you're not asking that I apply it, are you?

23         MS. GLASER DAUERMANN:  We're not, no.

24         THE COURT:  Okay.  So I did not want to spoil the

25 ending, but I do want to just go over the calculation of the

1  advisory guidelines range.  There's a base offense level of

2  six.  There is an 18-point adjustment given that the fraud --

3  the loss exceeded three-and-a-half million dollars but was

4  less than nine-and-a-half million.  There's another two points

5  for -- on the basis that the offense involved ten or more

6  victims.  Probation added that three-point adjustment and I

7  declined to apply that.  There are two points taken away

8  because Mr. Geykhman has accepted responsibility and then I

9  assume that the Government is -- I think the Government is

10 asking for that additional point to be taken off given the

11 timely notification; is that right?

12           MS. GLASER DAUERMANN:  That's correct, Your Honor.

13           THE COURT:  Okay.  So, that is a -- let's see, I

14 think that leaves us with 23.  Is that right?

15           MS. GLASER DAUERMANN:  Yes, that's correct.

16           MS. NEWMAN:  That's correct, Your Honor.

17           THE COURT:  Okay.  And a criminal history category

18 of one, and for that criminal history category the guideline

19 range is 46 to 57 months; is that correct?

20           MS. GLASER DAUERMANN:  That's correct.

21           MS. NEWMAN:  That is correct.

22           THE COURT:  All right.  So I know there were some

23 objections to the pre-sentence report.  I think I've already

24 dealt with this three-point adjustment and there are some

25 general objections and I think Probation made some changes

1    based on Ms. Newman's objections.

2              I don't think anything affects the guideline range;

3    is that correct?

4              MS. NEWMAN:  No, Your Honor, we did object.

5              THE COURT:  Sorry.  I'm so sorry.

6              MS. NEWMAN:  We did object to a lot of the factual

7    allegations in the PSR and as to that we still object and we

8    are -- we do believe that, because it could influence -- it

9    doesn't influence the guidelines, but it could influence the

10   Court with respect to a variance and because of that we

11   continue our objection to the factual statement of the offense

12   conduct contained in the PSR.

13             THE COURT:  Just in the most general terms, was an

14   objection to the description of him as playing sort of a

15   larger role than it's your position that he took; is that

16   correct?

17             MS. NEWMAN:  That is correct.  Just generally,

18   that's exactly right.

19             THE COURT:  All right.

20             Is there anything you want to say about that,

21   Ms. Glaser Dauermann?

22             MS. GLASER DAUERMANN:  I believe we've said

23   essentially everything we need to say in our papers, but I'll

24   just say this, that the defendant played a very important role

25   in the conspiracy and he was an active member and touched a

1   significant amount of the conduct involved in the conspiracy,

2   so that's why we have taken the position that we did.

3          THE COURT:  All right.  Well, I accept the

4   pre-sentence report, except for the application of that

5   three-point enhancement.

6          MS. NEWMAN:  Your Honor, if I then may -- I'm sorry,

7   Your Honor, if I may then make a record?

8          THE COURT:  Sure.

9          MS. NEWMAN:  Because the Second Circuit will then

10  say, You didn't make a record, Ms. Newman.  So I want to be

11  specific as to what statements in the PSR that I object to

12  most, in that general term.  I'm not going to go through all

13  of them.  I know that the Court has read my papers and I think

14  that they are very explicit and set forth the objections, but

15  there are objections that I think are just so wrong -- their

16  statements are just so wrong that they need to be corrected

17  least the Court take them as fact and then influence the

18  Court's decision.

19          So it's important to note, as the Court did, what my

20  client pled to and what he didn't plead to on Count One, as

21  the Court has said, but it's also significant for the Court to

22  understand that on the indictment on page two, which in

23  paragraph four through seven it names specifically the

24  defendant and relevant entities and individuals and of those

25  we just have Mr. Geykhman and Coconspirator One which we have

1  identified is the physical therapist.  We have also identified

2  that the recruiter, who was another physical therapist, a

3  Mr. Elsanna (ph) who was a cooperator, indeed we would agree

4  was involved in this.  So what I just want to point out is the

5  narrowness of this indictment.

6          With respect to him being the critical player, the

7  Court is well aware that everybody in a conspiracy plays a

8  role and to the extent that that role is critical every role

9  is critical, but of all the individuals in this case who

10  played a role as to those that are named as what I just

11  pointed out, Mr. Geykhman could easily have been replaced.

12  The physical therapist could only be replaced by another

13  physical therapist but a physical therapist was needed, and

14  Mr. Geykhman on the other hand -- and Elsanna was needed

15  because he was the recruiter for the therapist.

16          So as to the extent that Mr. Geykhman, yes, did

17  everything he said he did and admitted it in detail, that is

18  something somebody else could easily have done.

19          THE COURT:  I think I understand.  Just to be clear,

20  I imagine -- and I will let the Government respond -- I

21  imagine the Government is referencing some of the conduct in

22  connection with Count Two as relevant conduct; is that right?

23          MS. GLASER DAUERMANN:  Count Two is included in

24  relevant conduct, yes, Your Honor.

25          THE COURT:  And I just -- because I wanted to remind

1   myself of what it was that Mr. Geykhman said about what his

2   role was; he said he participated with others in a scheme in

3   which range of motion test result reports were sent to a

4   physical therapist who signed the reports as though she had

5   performed the test herself although she had not done the

6   testing.  A bill for the test would be sent to the no-fault

7   insurance carrier of the patient who was tested and the

8   insurance carrier would then send the physical therapist money

9   that was due for the testing and then that money was

10  distributed among the co-conspirators, and Mr. Geykhman said

11  that he had the tests picked up and taken from the physical

12  therapists but did not run the office.

13          His job was to make sure that the tests were picked

14  up and brought to the office.  And then Ms. Glaser Dauermann

15  just put on the record that the Government would prove that

16  they were no-fault insurance companies which are healthcare

17  benefit programs pursuant to statute.

18          That's just the conduct to which he pled guilty.  I

19  don't know if there is any response that you want to make to

20  counsel's -- what counsel said.

21          MS. GLASER DAUERMANN:  Yes, Your Honor, just very

22  briefly.  We would just note that the defendant makes a big

23  point of the fact that he was the one person who was the front

24  man, the gofer, the trusted man for this kind of shadowy

25  figure.  He claims to have been replaceable, but this man that

1    counsel has described does not sound like the kind of man who

2    would trust just anybody.  So the defendant -- even in the

3    version of the facts that the defendant is presenting, it

4    sounds like the defendant was quite a critical individual

5    indeed.

6         We have some additional thoughts as to what

7    Ms. Newman has said.  She's talked about other government

8    cooperators.  The Government has never confirmed whether or

9    not these individuals are cooperators.  In terms of the

10   remaining comments that Ms. Newman made, I believe our papers

11   essentially address those factual issues.

12        THE COURT:  Anything else you want to say about

13   that?

14        MS. NEWMAN:  No, I think that the Court is accurate.

15        So I just wanted to correct, essentially he wasn't a

16   recruiter, he didn't do the billing -- he was aware of it, I

17   don't want to be misunderstood.  It's one thing -- and I think

18   that's the confusion here, it's one thing to equate knowledge,

19   like a secretary has knowledge -- at least mine, of everything

20   I do, I hope, better than I do sometimes -- but that's not the

21   manager, the one directing it.  It added a distinction, it

22   wasn't knowledge; it was a distinction as to the role that he

23   was doing and that's it.

24        THE COURT:  Well, let me just clarify.  It's not

25   your position that he came up with this idea, is it?

1       MS. GLASER DAUERMANN:  Not at all.

2       THE COURT:  And it's also not your position -- is it

3  your position that he actually went out and recruited people?

4       MS. GLASER DAUERMANN:  It's our position that people

5  came to him and he in inducted them and further recruited

6  them.  I used the term recruited for what he did, but I agree

7  that he did not go out, pound the pavement and find the

8  people.

9       THE COURT:  So please correct me if I'm wrong, and I

10 have to say I did have a little bit of trouble -- I remember

11 the plea, but when I got all of these letters I did have a

12 little trouble trying to separate out what was what.  I mean,

13 there's a reason why you agree that the three-point adjustment

14 doesn't apply; correct?

15      MS. GLASER DAUERMANN:  That was a decision that we

16 made during plea negotiations.

17      THE COURT:  Right, but I think when you're saying

18 recruiting you are not saying that he went out to different

19 clinics and said would you like to participate in this; I

20 think what you're saying is that someone else did that, sent

21 them to the defendant who then continued in this process to

22 get whoever these people are on board.  Is that right?

23      MS. GLASER DAUERMANN:  That's correct, Your Honor.

24 People would hear via word of mouth that they could make some

25 extra money by speaking to the defendant, and participating in

1  this scheme, and they went to the defendant and the defendant

2  took it from there.

3          THE COURT:  Okay.  And then, the other thing just

4  since we're on this topic, the first count, the count to which

5  he pled guilty, that involves more than one physical therapist

6  and insurance company?

7          MS. GLASER DAUERMANN:  The specific scheme to which

8  the defendant -- the conspiracy to which the defendant pleaded

9  guilty was a conspiracy between himself and the one physical

10 therapist charged.  We believe the scheme itself was far

11 broader than that, but the conspiracy as charged was between

12 the defendant and CC 1.

13         THE COURT:  Okay.  Anything else that you wanted to

14 say about that, Ms. Newman?

15         MS. NEWMAN:  No, I think the Court is aware of now

16 the major thrust of the objection to the factual statements in

17 the PSR so I rest on my papers and I need not repeat them

18 because I think it's all been said.  Thank you.

19         THE COURT:  Okay, surely.  Okay.

20         As I said I did review all of the submissions, but I

21 will definitely hear from the parties and from Mr. Geykhman,

22 if he wants to say anything.  And I will do it in this order:

23 first Ms. Newman, then from the Government and then from Mr.

24 Geykhman, if he wishes to make a statement.

25         Ms. Newman, what else if anything would you like to

1   say?

2          MS. NEWMAN:  Thank you, Your Honor.

3          Again to put it into context, I don't think anybody

4   really disagrees to some extent of what Mr. Geykhman's role in

5   the offense was; I think it's more the language used to

6   describe it.  So with that said, for example, he was directed;

7   he didn't direct therapists.  It was part of the agreement

8   that was first entered into, it was our position that they

9   were recruited by the other therapists and they came -- but

10  that's just the language.

11         So let me then direct my attention to even the

12  basis -- I want to skip over some of my comments because

13  they're superfluous at this point.  Okay, let me go to our

14  variance argument --

15         THE COURT:  I'm just going to remind both sides --

16  and maybe this is just me -- just slow down a little bit.  I

17  just want to make sure our court reporter can get everything,

18  and I think it's okay if you want to remove your masks for

19  making statements.  I don't know if everybody's vaccinated,

20  it's entirely up to you, but sometimes it's a bit easier.

21         MS. NEWMAN:  Thank you.

22         THE COURT:  So I'm not going to --

23         MS. NEWMAN:  Your Honor, I truly appreciate it.

24  Believe it or not, I've had a hearing loss I think.  I want

25  you to know I think, I haven't gotten it tested, but it's

1  because I don't hear that well in court anymore so I think it

2  and it may be the masks.  But no, I feel safer being advanced

3  in age but we won't say how advanced.  Okay?

4          THE COURT:  No, we won't.

5          MS. NEWMAN:  The variance arguments we have to begin

6  by just the loss calculation argument that I advanced, that I

7  really do think it's appropriate in this case.  Certainly

8  judges have made comments about that the loss guidelines in

9  many of these cases -- and I believe this is one, is just a

10  poor proxy for the defendant's real culpable conduct here.

11  And I say that because here, remember, he picked up boxes;

12  they weren't medical records, they were tests.

13          Now, I can describe the range of motion test, which

14  is a machine, and they do -- you know, they do various pushes

15  and pulls and a computer sheet emanates and then there's a

16  signature who performed it, and basically the fraud was a

17  physical therapist didn't perform it, a technician performed

18  it.  Not that a technician can't perform it, but the

19  Government's position is simply that the insurance company

20  would not have paid if a technician only had performed it, but

21  there is no question there is a fraud because the therapist

22  signed it and didn't perform it.

23          So there's no question about the fraud, but then we

24  go to what kind of control?  And he didn't control the number

25  of tests, he had no understanding.  There was a box, as the

1    Government suggests, that he called the driver to pick up and

2    deliver.  Even if he had opened the box, but he never had the

3    box, but he wouldn't know one test from another other than

4    that they were called range of motion and function capability.

5    So they are -- to an extent that I guess they are medical

6    records, but it's the -- I want the Court to understand they

7    were very narrow, they were just tests that had to be signed.

8              THE COURT:  Feel free not to answer this question if

9    you can't or don't want to, but how did this start?

10             MS. NEWMAN:  Oh, Your Honor, this kind of fraud

11   having been around the block a few years --

12             THE COURT:  I want to know how he got started in it.

13             MS. NEWMAN:  Oh, okay.  So Mr. Safer, who was

14   involved in many frauds --

15             THE COURT:  And who is deceased; is that correct?

16             MS. NEWMAN:  Yes, he is now deceased.  And there are

17   others involved in this fraud, from the medical aspect of it,

18   that my client had no -- and certainly would not have had any

19   interest in or exposure because that would be the normal way

20   that these frauds are conducted that they're compartmentalized

21   so that one doesn't know about the other.

22             So, in any event, he had a serious gambling and drug

23   problem --

24             THE COURT:  I remember.  I remember now.

25             MS. NEWMAN:  Mr. Safer was his supplier and his

1  bookie, so to say, and they would go to Atlantic City together

2  and he owed him all of this money, and so Mr. Safer says, you

3  know, I've got an idea for you, why don't you -- because he is

4  a trustworthy, responsible person.  It's not good for this

5  crime, but it is for other aspects of his life.  And, I've got

6  an idea, you can get rid of your debt to me and why don't you

7  just do this, and it was -- it seemed like a good idea, but

8  needless to say, as you can tell from Mr. Geykhman's letter to

9  the Court, he recognizes -- and he recognized soon thereafter,

10 this was not such a good idea but he certainly wasn't going to

11 pull out in light of the connections that Mr. Safer had.

12        But there's no question that this kind of fraud has

13 been around for quite a while.  I've had other cases many,

14 many years ago with this and they continue to pop-up about

15 these no-fault insurance cases.

16        THE COURT:  Well, I'm definitely aware of those.  I

17 had forgotten for a moment how it was that he became involved

18 in it.

19        I'm sorry to interrupt, go ahead.

20        MS. NEWMAN:  That's fine.  So that's how the

21 involvement -- and he continued to gamble.  I just want it

22 clear that he's not trying to minimize anything that he did.

23 He's not trying to minimize that he continued to use drugs,

24 which of course then only enhanced the amount of money that

25 was due and so money never really got to his fingers.  There

1  was a ledger that went down.

2          Okay.  So when we talk about a loss that was an

3  18-level increase, which is driving this guideline, right, we

4  have to look at what is it about and how was it he drives it?

5  He didn't control the therapists and the amount of therapists.

6  He didn't control the number of tests and he didn't control

7  the amount of money that would be collected.  He got his small

8  share.  That's what he did.  He didn't -- so I just want the

9  Court to know that's the basis.  And the basis that we're

10  saying isn't just because I'm saying it.  You know, Judge

11  Rakoff has said that there's a difference -- I'm sorry --

12          THE COURT:  I've read it.

13          MS. NEWMAN:  But it wasn't Judge Rakoff, it was

14  Judge Lynch who said there's a difference that we should

15  consider because it doesn't necessarily -- not for everybody

16  does it equal the conduct.  And, so -- and this is well-known

17  in this circuit.  So that's how at first we think that a

18  variance should be applicable there.

19          And talking of Judge Rakoff, it was Judge Rakoff

20  which I quoted on page 11 of my sentencing memo that talked

21  about how much background and character are important in a

22  sentencing decision.  They are so important in life and

23  they're important in a sentencing decision which is one of the

24  most important things that he -- that my client is going to

25  face.

1       So we know a lot about his background and we know

2   that he was an immigrant from what -- and back when it was the

3   USSR, and we know what's happening now and that they're trying

4   to take back the Ukraine, and he's in fact, as I indicated, a

5   volunteer -- immediately.  Not because of this case, it has

6   nothing to do with this case, but being somebody from Ukraine,

7   he -- you know, he had a somewhat different childhood as an

8   immigrant.  His parents divorced.

9       His father could not make it here, had difficulty

10  making it and was -- used alcohol.  It was certainly something

11  that he was predisposed to.  We know that his brother has a

12  problem with drugs, and a cousin.  Now, that doesn't excuse

13  it, it kind of explains that this is somebody who needs

14  treatment and towards that I would like for the Court to

15  understand when he was first arrested he mentioned, and we

16  called Pretrial Services -- and I understand it's the middle

17  of COVID, and they're saying really?  Yeah, how would you like

18  me to get you this, I have a long list of people who now are

19  using and in dire need of this treatment that we can only do

20  virtually, right, and there's a long line.  He seemed to be

21  okay and he was.

22      He stopped everything to his credit and he is okay,

23  but he recognizes and he has gone to AA for some treatment to

24  see what he could do.  He doesn't want to fall back.  So what

25  kind of stresses?  This is the most significant stress in his

1  life and he has not reverted to gambling, that high, and he

2  hasn't reverted to drugs.  So he's well on his way, we have to

3  say that.

4         His mother had an accident when he was in tenth

5  grade, and as is his nature which is clear from all the

6  letters that the Court has received, he is somebody who puts

7  himself last and everybody else first.  I was amazed that

8  somebody who went to Midwood -- I grew up in Brooklyn, so I

9  know Midwood which was one of the neighborhood high schools --

10 you don't quit high school.  You know, it's just that

11 immigrant philosophy.  We're going to be better, we're going

12 to better, the next generation, but he felt he had no choice.

13 His mother almost died, you know, became crippled, and his

14 stepfather was not bringing in enough -- his mother had

15 worked, which was a needed income, and he took it upon himself

16 to leave school.

17        He had dreams of going to Brooklyn College.  He was

18 doing well in school and he -- you know, that was not a good

19 decision because he floundered from there on.  He tried being

20 a barber and he tried various -- but it never took because he

21 always felt inadequate.  And this is another thing that I've

22 spoken to him that he needs to get therapy and I believe that

23 his wife agrees.

24        So he meets the love of his life and Julia Geykhman

25 meets the love of her life, as she says, and they married.

1    But it is a rocky marriage.  Not because they don't love each

2    other, but because of his problems.  So it ruined his

3    marriage, but the saviour in his life is his children.  So,

4    2008, his son is born and thereafter he becomes the person who

5    is the primary caretaker of the children.  He can't contribute

6    like his wife, who rises the ladder and becomes a successful

7    attorney.  When I read her letter I must tell you I cried.  I

8    still cry, thinking about it, because I think of all that my

9    husband did for me and unless you live life like that and have

10   that experience, you know how much they've given up.

11          So his children are a credit to them both and he

12   would tell you that.  He would never take full responsibility.

13   That's just his nature.  But others around say it's him

14   because he's the primary caretaker but it's not just -- you

15   know, I'm going to drop you off at ice skating, I'm going to

16   drop you off -- no, he's there all the time.  He's with the

17   teachers, he's with them with homework.  He is with them at

18   all times.  He takes this, as he should, extremely serious.

19          So I took offense as unemployed.  Forgive me, but I

20   took offense.  I was at one point a stay-at-home mom and it

21   ain't easy, so.

22          THE COURT:  I don't think they meant it that way.  I

23   saw the clarification in the Probation report, I think it just

24   refers to whether you have a job outside of the home.

25          Am I right about that?

1          MS. BAUMANN:  That's correct, Your Honor.

2          THE COURT:  It might be something to think about in

3     the future, but that's the way I understood it.

4          MS. NEWMAN:  I understood, and I explained that.  I

5     took offense to it personally.  I understand that -- because I

6     do think they earn money in the sense of -- and he was earning

7     his room and board in a sense.

8          We also know that his marijuana addiction that began

9     when he was 14 does affect the brain, so people who say

10    marijuana is nothing should read the science and the medical

11    reports; when it starts as a teenage and becomes an addiction

12    it affects the brain and changes the brain.  That's what the

13    experts tell us, and he then went to cocaine and alcohol.  So,

14    what we understand from the background doesn't -- it just

15    gives us some understanding, but as far as the true character,

16    who is this individual?  Who is he?  Does he have integrity as

17    to other things?  Is he a good person as to other events in

18    his life?

19          Is he someone that can be trusted otherwise?  There

20    is -- it's true, there was a side of Mr. Geykhman because of

21    his background and his own shame in not being somebody

22    successful in the eyes of others because of monetary reasons,

23    that is true.  It led him to do things that he is very

24    shameful of, but that doesn't mean it describes all of him.

25    That does not equate to who he is, and when we look at that

1  and we look at how contrite he is, we know that he has the

2  minimal risk of recidivism, close family ties, his age, his

3  criminal history category one, nonviolent offense,

4  contributing member of society and great remorse.

5              So I want to emphasize and again I would point the

6  Court to page 31, last paragraph, of my sentencing memorandum

7  which I think accurately states from my notes of my

8  conversations with the Government, but -- so I do think he has

9  really done more than normal in acceptance of responsibility.

10             THE COURT:  I am so sorry to interrupt you.

11             MS. NEWMAN:  Sure.

12             THE COURT:  I realize that I meant to ask about this

13  before, do you have an unredacted page 31 of your submission?

14             MS. NEWMAN:  Yes, that's what --

15             THE COURT:  For some reason I don't have it and if

16  you could get it up to me?  I meant to ask about that before.

17             MS. NEWMAN:  Sure.  I'm sorry.

18             THE COURT:  No, no, no.

19             (Counsel approaches.)

20             THE COURT:  I just want to take a look at it.

21             Is it marked, Ms. Newman?

22             MS. NEWMAN:  No, I did not mark it up, but it's the

23  last paragraph on page 31.  It makes reference that it would

24  be redacted.

25             THE COURT:  I was aware of this in substance but I

1   wanted to make sure.  Thank you.

2           MS. GLASER DAUERMANN:  Does Your Honor have the

3   unredacted version of the Government's response?

4           THE COURT:  I think I do.  I had made a note to

5   myself, but let me double check.  I think I do.

6           Which page was it on?

7           MS. NEWMAN:  Mine?

8           THE COURT:  No, in the Government's.

9           MS. NEWMAN:  I believe it was --

10          THE COURT:  I think it's on page five, maybe.

11          MS. GLASER DAUERMANN:  I believe it's footnote three

12  on page five.

13          THE COURT:  I think that's something different.

14  That has to do with this question but there is a reference to

15  it in that paragraph, that proffer.

16          MS. GLASER DAUERMANN:  Yes, it's page five, the

17  second paragraph.

18          THE COURT:  Right, right, right.

19          MS. GLASER DAUERMANN:  Thank you.

20          THE COURT:  I apologize for that.  I just wanted to

21  make sure -- I knew about it, I just wanted to make sure I had

22  it all.

23          Go ahead.

24          MS. NEWMAN:  I will send it to the Court in case the

25  Court doesn't have it in unredacted.  I thought I did, but --

1    THE COURT:  Do we have an unredacted?  Is it filed

2 on this docket?

3    MS. NEWMAN:  No, I sent it by --

4    THE COURT:  Oh, we might not have it.

5    MS. NEWMAN:  I did e-mail it, but I did not -- I

6 know because I didn't file an unredacted under seal.

7    THE COURT:  That's okay, we probably do have it.

8 It's not very long and I read it, I certainly knew about it,

9 so I must have seen it somewhere.

10   MS. NEWMAN:  If there's a problem just let me know

11 and I'll send you a new one.

12   THE COURT:  We'll let you know.  I think we probably

13 do have it.  Anyway, sorry about that.  Go ahead.

14   MS. NEWMAN:  I also wanted to indicate that the

15 language uses -- as I mentioned, it says that he laundered the

16 proceeds, it's a conspiracy.  He didn't go to the bank, I just

17 wanted the Court to be aware, and he didn't direct or go to

18 the bank or anything like that which I think it's important.

19   So all in all, Your Honor, I think when we ask for a

20 sentence of 20 months it's within that which is the range of

21 comparable sentences that are given for comparable frauds.

22 And I often think about long prison sentences and 46 months

23 for my client, even at the low end, is extraordinarily long in

24 light of how his relationship with his children and it's

25 extraordinarily long for his children.  We are not asking for

1   a departure, this is not a family circumstance for departure,

2   this is not that at all.  It's a matter of how it affects his

3   children emotionally and him emotionally and that's a

4   punishment, that's what we're saying.

5          And as far as deterrence, I just question that

6   because these frauds repeat and repeat and repeat; it's not a

7   deterrent.  What is a deterrent, frankly, and what the

8   academic research demonstrates is that when somebody is

9   punished and we're talking about collateral consequences of a

10  felony conviction which are extensive, when we talk about

11  forfeiture and the amount that is punishment, it inhibits the

12  ability to earn when it pertains to what for him is an

13  enormous amount of money.

14         Although, I have to say when you're talking about in

15  comparison to what the Government alleges is this fraud and

16  the amount, his is just -- you know, it's less than 3 percent

17  so it's a pittance.  But that's not to him.  To him it's an

18  enormous amount and it's punishment.  And it's restitution,

19  which I understand we'll talk about later, but in any event

20  restitution is not applied here.  All of this on top of this,

21  all of these things, and nonetheless we're not saying that he

22  shouldn't do -- have some punishment.  We're not saying that,

23  Your Honor.

24         And so this, in that community, is enormous when you

25  talk about deterrence but he's not leaving the community.  So

1   you're talking about somebody who is there well-liked and

2   spreads the word, right?  Don't think you're going to get away

3   with this; look at me, look at what I've done, look how it

4   affects my family which is the most important thing to him.

5   So this -- a sentence of 20 months is not a slap on the hand.

6   It is not.  Not in the reality of this case.

7           When all things are considered, I think a sentence

8   of 20 months is really a reasonable request and it is a

9   request that is more than sufficient to meet the goals of

10  sentencing here.  And it is this individual, not the people

11  outside, that this Court is sentencing and I think the Court

12  has a very good idea of Mr. Geykhman from all the letters that

13  the Court has received and I know that it has read.

14          If there's any other questions I am happy to answer

15  them.

16          THE COURT:  No, I thank you for your presentation.

17          Does Government want to expand upon their letter?

18          MS. GLASER DAUERMANN:  Yes, Your Honor, just very

19  briefly and then hit a couple of the points that Ms. Newman

20  raised.

21          Your Honor, the Government's sentencing submission

22  is clear, the PSR makes clear, that the defendant was a

23  critical piece of this criminal conspiracy.  He was the one

24  running the show on a day-to-day basis.  Whether or not there

25  was a shadowy figure in the background, the defendant was not,

1   to use his own words, a puppet.  He deliberately made the

2   decision to commit this crime for the sake of money.  He put

3   his family to the side and he went ahead and did something

4   that he knew could result, if things went badly, in him being

5   taken away from them.  So this is not someone who is kind of

6   being pushed around by outside forces.  This is a man who, on

7   of his own volition, decided to participate in this criminal

8   conspiracy for years.

9              THE COURT:  For years?

10             MS. GLASER DAUERMANN:  Although the scope of the

11   conspiracy charged in the indictment is only very brief, as

12   the PSR set forth, he was involved in this since at least 2017

13   and it didn't stop until he was arrested.  It didn't stop when

14   Safer died.  It kept going.  And so the defendant has been

15   involved in this for a very long time, he was an important

16   part of it, and this is not the first time he was accused of

17   having to do with healthcare fraud.

18             THE COURT:  That was a civil case, wasn't it?

19             MS. GLASER DAUERMANN:  There were two civil cases.

20   There was one early on in the early 2000s and then he was

21   accused of it again in 2013.

22             THE COURT:  Were those default judgments?

23             MS. GLASER DAUERMANN:  There were.  There were a

24   number of defendants and nobody appeared which is fairly

25   typical for those kinds of lawsuits.

1      THE COURT:  Do you think that's something that I
2  should take into consideration?

3      MS. GLASER DAUERMANN:  I think it's relevant for the
4  Court's information.  It's on the public docket, the Court can
5  consider it.  We're not asking Your Honor to rely on it in
6  terms of sentencing, but in terms of the recidivism question,
7  you know, this is not the first time that the defendant -- I'm
8  not saying that he did or did not do those things because --

9      THE COURT:  I will say I don't really see that as
10  the -- it's sort of framed in terms of prior behavior, but I
11  don't think it's entirely fair in the context of a civil case.
12  I'm not accusing him -- I just don't see it in quite the same
13  way.  I mean, I noticed it, but I don't -- and I don't think
14  you're asking me to consider it as prior criminal conduct.

15      MS. GLASER DAUERMANN:  That's absolutely correct.

16      THE COURT:  I do have a question for you, though,
17  because I think it's a fair point and this is always the case
18  in violations like this, is that the guidelines there almost
19  exclusively loss driven, is that right?  And I'm just
20  interested, since you're asking for -- what is a substantial
21  sentence?  It's driven by the loss created by all the
22  participants in this scheme; is that correct?

23      MS. GLASER DAUERMANN:  That's correct.

24      THE COURT:  I mean, is it your position that every
25  person -- that the loss amount is an accurate reflection of

1  what this defendant -- I guess it is, the fact that he

2  deserves that kind of sentence?

3           MS. GLASER DAUERMANN:  Yes, Your Honor, and I can

4  speak to the loss issue.  The one instance that was charged

5  this indictment was one of at least eight that the Government

6  knows about and has discussed with defense counsel.  It

7  happened over and over again, sometimes with the same physical

8  therapist and then sometimes there were other physical

9  therapists who joined and, you know, did their eight to ten

10 weeks of signing false documents and then stopped.  The

11 defendant was the one, for each of them, who brought them into

12 the scheme -- once they approach him, he brought them in.  He

13 was in charge of getting the weekly boxes of tests to them to

14 sign.

15          He was the one who saw everything that was deposited

16 into their bank accounts.  So, although the defendant might

17 not have decided how many tests to send that week, the

18 defendant was aware of the amount of money that each one of

19 these individuals were going to steal from the insurance

20 companies, he discussed with them the amount of money that

21 they could expect to make and that they would be getting 10

22 percent of what was taken in.  He --

23          THE COURT:  What did he get, 180,000?

24          MS. GLASER DAUERMANN:  That's what we agreed with

25 defense counsel, based on his proffer to the Government.

1        But in terms of what kind of money that was involved

2   in the conspiracy, the defendant was the one who -- and there

3   were texts to this effect that were turned over -- would text

4   the physical therapist and say, you know, X amount of money

5   was deposited this week, you can take your share, your share

6   is X amount.  And that happened over and over and over.  And

7   so the defendant, regardless of whether or not he controlled

8   how many medical records were being generated, he certainly

9   knew exactly how much money was being stolen and that is

10  essentially what the loss is a proxy for, it's the size and

11  scope of the scheme.

12        And in this case the defendant was well aware that

13  what he was essentially running on a day-to-day basis was a

14  very significant scheme that involved millions and millions of

15  dollars, nearly 7 million is the loss amount that was agreed

16  on in this case, and we do believe that the loss is a proxy

17  for a very fair approximation of the scope of this scheme.

18  This was not a small scheme, this was not a short scheme.

19  This was something that went on for years and it involved a

20  significant amount of money, a significant amount of people, a

21  significant number of patients.

22        You know, we haven't talked about the patients at

23  all because the Government is not alleging that there was

24  fraud on the side of the patients.  But, you know, there were

25  a number of claims involved and a number of people involved,

1   and the defendant was aware of the scope of the scheme and he

2   deliberately decided to stay.  Whether he felt like he

3   couldn't leave or not, it was his decision to stay, it was his

4   decision to take that risk.

5          So that is why we believe that the loss is

6   appropriate as a proxy for the scope and it is an appropriate

7   way of measuring the seriousness of the scheme.

8          THE COURT:  Okay.  I cut you off and I didn't mean

9   to.  Is there anything else you wanted to say?

10          MS. GLASER DAUERMANN:  I just wanted to respond to a

11  couple of other points that Ms. Newman made, that -- that the

12  defendant was essentially someone who kind of got in over his

13  head.  He stayed.  That's --

14          THE COURT:  He stayed.

15          MS. GLASER DAUERMANN:  He stayed.  And whether or

16  not he felt that he was threatened, he stayed, and he decided

17  to stay because he was making money and because the financial

18  consequences of leaving would be serious.  That, we believe,

19  is more than enough reason to hold him responsible for what

20  was a very serious fraud.  As for the remaining comments, we

21  will rest our case unless Your Honor has questions.

22          THE COURT:  Thank you very much.

23          Do you want to respond at all?

24          MS. NEWMAN:  Yes, if I may have a moment with my

25  client.

1          (Pause in proceedings.)

2          MS. NEWMAN:  Your Honor, I really have just a few

3     very quick points to make.  Again, it's conflating knowledge

4     with control and there's no question -- and we made that

5     clear, that he was aware because he got lists from Mr. Shafer

6     which he then sent.  There's a difference between a

7     secretary -- and I'm not saying he's a secretary, it's just a

8     secretary has so much knowledge and that's why I'm using that

9     analogy, and a control in what happens and we certainly

10    wouldn't hold the secretary responsible for all the harm as

11    far as loss -- in loss cases.

12          And so I'm not asking for minor role, I just want to

13    be clear, but I do think that it's not a proxy for when you

14    don't have that kind of control.  And the fact that it -- the

15    Government's point is it lasted years, I think we've explained

16    why it lasted years.  It wasn't something that was continual,

17    and I think that's clear also, and he did get in over his

18    head.  He did, but he also got in over his head because of his

19    drug use and the gambling.  And I did want to point out one

20    other point and that is he stayed in through -- almost his

21    arrest.  So what is normal in these cases, the case goes --

22    and Mr. Geykhman had nothing to do with this part of the case,

23    it goes to arbitration.  Having done personal injury when I

24    first started, and so I have somewhat of an understanding so

25    many, many of them go to arbitration.  So the claim is

1   rejected and they go to arbitration or, which often happens,

2   the claimant is sent for an examination by the insurance

3   company.  That's just the normal course, okay.

4           So when they win some arbitrations or the attorney,

5   who Mr. Geykhman had known, negotiates the fee -- you know,

6   the claim, the money is sent subsequent to the therapist then

7   saying -- you know, or Shafer saying this was done with a

8   therapist.  So after that, there were additional monies that

9   would come in.  Even then after the Government submits the

10  objection to Probation that the discovery that I had been

11  asking for throughout the litigation is then produced.

12          This discovery, as the Government indicates, well,

13  they didn't have to produce it because it had to do with text

14  messages between Elsanna and my client with respect to these

15  monies that were coming in and he had first forgotten all

16  about it because, after all, the indictment ends in January

17  2020.

18          THE COURT:  Is this related to the money coming from

19  arbitration?

20          MS. NEWMAN:  Yes, exactly.

21          THE COURT:  Okay.

22          MS. NEWMAN:  And so what is clear from those text

23  messages is it was Elsanna who has direct contact with the

24  therapists over this period of time, unbeknownst to us.  So,

25  in a way, it showed he wasn't the only one who was so involved

1  in the day-to-day with the therapists because they wanted to

2  communicate to the therapist this money was coming in, the

3  arbitration money, et cetera.

4          Suffice it to say we weren't talking about role.  I

5  just want the Court to understand what was happening in this

6  case and the Government says, on page five, footnote three --

7  which I do believe is in any copy that the Court would have of

8  it, the second paragraph of footnote three, is that the text

9  messages that they subsequently gave us during sentencing,

10  after I wrote my sentencing memo, largely pertained to the

11  defendant's conspiracy with the counterparty that the other

12  physical therapist, the recruiter Elsanna, the owner of

13  several clinics that participated in other iterations, also

14  misleading, of a no-fault fraud which was not charged in this

15  case.  So their position is we didn't have to have turn it

16  over since those iterations were not charged in this case.

17          THE COURT:  Does it make it easier to tell you that

18  that's not really having any effect on my sentencing decision?

19          MS. NEWMAN:  Fine.

20          THE COURT:  I don't want to cut you off --

21          MS. NEWMAN:  No, I don't want to go where it's not

22  necessary.  But that was one thing I wanted to say, so it's a

23  matter of control versus knowledge.  Knowledge doesn't

24  necessarily mean control.  And it is the -- as the Commission

25  has pointed out, that's what the guidelines -- you know the

1    different enhancements in 1B1.1 were geared to do, which was

2    to really punish more the people who had the larger stake, the

3    money in their reward that they were getting.  That's why

4    other courts where -- in similar situations, have granted a

5    variance.  Thank you.

6              THE COURT:  Thank you so much, Ms. Newman.

7              Mr. Geykhman, you have a right to make a statement,

8    too, if you would like.  If you want to do that, that's fine.

9    I'm just going to ask that you use the microphone, just make

10   sure it's on.

11             You can move it closer to you if that's more

12   comfortable.

13             THE DEFENDANT:  I do want to make a statement.  I

14   just want to say that, first of all, I want to apologize to my

15   family, to my children, for my role in this.  I wish I could

16   take everything back.  Unfortunately, I can't.  I love you

17   guys and I'm very, very sorry for everything.

18             And I would like to apologize to the Government and

19   to the victims of this fraud, because there are victims, and I

20   wish I could also take this back and unfortunately I cannot.

21             To Ms. Newman, I would like to thank her very, very

22   much for everything that she's done for me.  She's not only

23   been my attorney, she seemed like a friend and nobody has ever

24   fought for me as hard as Ms. Newman, and I appreciate it and I

25   wish I could thank her in other ways but unfortunately I

1  cannot.

2          This does not define me.  I can be a better person.

3  I have dreams and I have hopes and I will make sure that,

4  after doing my time, I will have these hopes and dreams come

5  true.  That's it, thank you.

6          THE COURT:  Mr. Geykhman, thank you so much.

7          Well, sentencing another human being is the hardest

8  thing a judge has to do and this case is no exception.  Just

9  so -- and I know the parties are aware of this, that I am

10  considering all of the factors that are laid out in this

11  statute at 18 USC Section 3553(a), which includes the advisory

12  guideline range, to make sure that the sentence that I impose

13  is sufficient but not greater than necessary to meet the

14  purposes of sentencing.  Those purposes are that the sentence

15  must reflect the seriousness of the crime, that it must

16  promote respect for the law, that it must be fair and just,

17  that it must act as a deterrent not just to the defendant, but

18  to anybody else that would contemplate participating in a

19  similar offense.  The public has to be protected from future

20  crimes by the defendant.  I am also mindful of the need to

21  avoid unwarranted sentencing disparities and, of course, like

22  every judge, I consider the individual before me, including

23  his history and the details of the offense.

24          A comment first about the effects on innocent people

25  which, unfortunately, is a byproduct of every criminal

1   enterprise when a person is called to answer for it, that the

2   people who didn't do anything wrong have to suffer.  That's no

3   less true in this case.  I do wish that people paused to think

4   about this before engaging in criminal conduct; that the often

5   devastating effects on family and on friends, on community,

6   sometimes we don't realize that until it comes time to accept

7   responsibility.

8          I think your expressions of remorse are sincere and

9   having read all of the letters in support of you put by your

10  ex-wife, by your son, made it clear that you play a very

11  critical role in your family and that they love you very much,

12  and I've certainly taken that into consideration.  But, again,

13  keeping in mind that's one of the hardest things about this

14  process is that there are so many people that are affected by

15  it.

16         I will say that, whether or not Mr. Geykhman could

17  be replaced is really not the issue to me.  I mean, this kind

18  of a scheme which is -- it seems to be rampant, can't happen

19  without participants like Mr. Geykhman.  There has to be a

20  person in his position in order for the crime to take place.

21  And it is serious.  It's -- it's payment for things that

22  either weren't performed correctly or weren't performed at

23  all, and it diverts resources from people who need them and

24  it's serious.

25         I think the Court does have to focus on the need for

1  deterrence and I have to say I part company with Ms. Newman on

2  that.  I think that there is a deterrent effect in a case like

3  this of a penalty and, so, I am mindful of that.

4           On the other hand, I do take into account

5  Mr. Geykhman's personal circumstances and, you know, you said

6  what I was going to say that none of us is defined by the

7  worst thing we've ever done.  You're really a young person and

8  Ms. Newman talked about you once had plans to go to Brooklyn

9  College.  You could still do that.

10          I think you got your GED; is that right?

11          THE DEFENDANT:  Yes.

12          THE COURT:  And so it's never too late to make a new

13  start.  And, so, I think you can still do that.

14          I also take into account -- it's not an excuse, but

15  it provides context, is that the defendant did struggle with

16  addiction and perhaps that was a driver for this.  While I

17  agree that the crime was a serious one, I don't agree with the

18  Government at least in the description of him as sort of

19  running the show.  It doesn't appear to me that that's the

20  case without minimizing what he admitted doing.

21          As for the loss, I think everybody agrees the loss

22  amount is what drives the guidelines, the guideline range.

23  And, you know, as in any case, the guidelines are a starting

24  point but they're not necessarily the place to finish.  It's

25  certainly true that the loss of this overall conduct is large,

1    but in my view focusing only on a loss would result in a

2    sentence that is not commiserate with the conduct and it would

3    result in a sentence that was greater than was necessary to

4    achieve the purposes of sentencing.

5            So, with all of that being said, after having

6    reviewed the conduct and Mr. Geykhman's background, and I also

7    find his expressions of remorse and regret to be sincere and

8    I've seen some that are sincere and some that are not, I think

9    a sentence of 24 months is the appropriate sentence in this

10   case.  It will be followed by two years of supervised release.

11   A condition of that supervised release would be an evaluation

12   for substance abuse and this is laid out in Probation's

13   recommendation, but I will put it on the record so it's clear

14   that he will participate -- and I believe it's something that

15   Mr. Geykhman wants to do as well.  So he will participate in a

16   substance abuse evaluation and if it's necessary an outpatient

17   drug treatment program that Probation approves.  He must

18   contribute to the cost of the treatment, not to exceed a

19   reasonable amount as determined by the Probation Department's

20   sliding scale for substance abuse treatment services.

21           He will have to cooperate in securing any applicable

22   third-party payment, like insurance or Medicaid, and he will

23   have to disclose all financial information and documents to

24   Probation so that they can assess his ability to pay.  During

25   treatment and after treatment, the defendant can't consume

1  alcohol or drugs, or any intoxicants, unless he has a

2  prescription by a licensed doctor and proof is provided to

3  Probation, and he will have to submit to drug testing and

4  alcohol testing to ensure abstinence.

5          There is also a $100 special assessment and I don't

6  recall if I have signed the forfeiture order yet.

7          Have I done that?

8          MS. GLASER DAUERMANN:  I am not sure, Your Honor.

9          THE COURT:  But I think that's agreed upon, is that

10  true?

11          MS. NEWMAN:  Yes, that is agreed one.

12          THE COURT:  So I will sign the forfeiture order if I

13  haven't already done so.

14          We will discuss this issue of restitution, at least

15  sort of in general terms, but I want to notify Mr. Geykhman of

16  his right to appeal.  You can appeal if you believe that your

17  plea was unlawful or involuntary, or if there is some

18  fundamental defect in the preceding that you didn't know about

19  when you pled guilty.  If you appeal you have to file the

20  Notice of Appeal within 14 days of the filing of the entry of

21  the judgment or within 14 days of any Notice of Appeal by the

22  Government.  If you ask, the Clerk will prepare and file a

23  Notice of Appeal for you.  If you can't afford to pay for an

24  appeal, or for an appellate lawyer, you have the right to

25  apply for leave to appeal in forma pauperis.  That means that

1   you can apply to have the Court waive the filing fee.  You can

2   also file on appeal for a court appointed lawyer.

3             Are you moving to dismiss Count Two?

4             MS. GLASER DAUERMANN:  I am, Your Honor.

5             THE COURT:  Okay, that is dismissed.

6             And in terms of a surrender date, is there a

7   particular facility you want me to recommend?

8             MS. NEWMAN:  Yes.  Mr. Geykhman is kosher and so I

9   do know Otisville is a place in which they do have a kosher

10  kitchen.  They are, in fact, preparing for Passover, I

11  understand.  And so we would ask for self-surrender when he is

12  assigned.  So we would request Otisville and a self-surrender

13  when assigned.

14            THE COURT:  All right.

15            Can we pick a date?

16            MS. BAUMANN:  Your Honor, if I may be heard on that?

17            THE COURT:  Sure.

18            MS. BAUMANN:  I believe my understanding right now

19  as far as intakes or going, it may take up to eight weeks or

20  more than that.

21            THE COURT:  That's what I thought, so should we move

22  it to the end of June maybe?

23            THE COURTROOM DEPUTY:  June 30th?

24            MS. NEWMAN:  I mean, we're waiting for whatever it

25  is -- if it's sooner, they usually let us know, and if it's

1    later, I usually get to them and say, hey, don't forget us.

2    Just so that I haven't missed an e-mail, but of course I

3    invite Probation to please contact us both.

4          THE COURT:  Well, why don't we set June 30th for the

5    date and if something happens that it's not ready by then, we

6    extend it.

7          I also do want to thank Probation.  I think you had

8    a lot of last-minute work to do to get ready for today.

9          MS. BAUMANN:  That's quite all right.

10         THE COURT:  I do appreciate it.

11         MS. BAUMANN:  I just want to be heard on the

12   restitution, if that's okay.  I understand it's not going to

13   be discussed, the amount, but if the Court is going to be

14   imposing an amount of restitution at some point, we would

15   request an additional condition of supervision be imposed for

16   a full financial disclosure just so we can monitor his

17   compliance with it.

18         THE COURT:  Sure, I think we can make that a

19   condition -- well, does he have to pay the forfeiture also?

20         MS. NEWMAN:  Yes.

21         THE COURT:  So do we need to set up a schedule for

22   that or has he already paid it?

23         MS. BAUMANN:  He has not already paid it, so I would

24   ask Your Honor to set a schedule for that.

25         MS. NEWMAN:  I think usually there's a schedule and

1  I think there's no interest on forfeiture; correct?

2          THE COURT:  I do not know the answer to that.  The

3  schedule is usually -- I think it's 10 percent of monthly....

4          MS. BAUMANN:  Gross monthly income.  With our

5  standard language for full financial disclosure, it would be

6  up to the defendant to prove his inability to pay that amount

7  in which we would then readdress the Court for a different

8  monthly payment.

9          THE COURT:  Okay.  So at least for the forfeiture

10  the schedule will be, upon release, 10 percent of gross

11  monthly income.  I think in terms of the restitution, if it

12  works for everybody, I think we have to determine what that

13  amount is, but the financial disclosure aspect of that will be

14  a part of supervised release.

15          I think you probably also need the financial

16  disclosure for the forfeiture as well, is that right?

17          MS. BAUMANN:  I don't believe that the Probation

18  Department is able to enforce his payment on that, just with

19  the restitution.

20          THE COURT:  Okay.

21          MS. GLASER DAUERMANN:  Your Honor, I will note that

22  the financial disclosure to the Government was an aspect to

23  the plea agreement which the Defendant has not yet done,

24  despite the date passing, so I would ask that Your Honor

25  direct him to comply with that.

1      THE COURT:  All right.  So that's also going to be a

2   condition, his full financial disclosure.  Correct me if I

3   don't have all of the language on this right, but that

4   includes advising Probation of any accounts and any employment

5   that you have, whether it's self-employment or any kind of an

6   employment.  And would a condition of that also be not to open

7   any new accounts without Probation's knowledge?  Is that

8   necessary in a case like this?

9      MS. BAUMANN:  That would be at Your Honor's

10  discretion, but it would make sense just because of the

11  commingled income but I would definitely leave it up to Your

12  Honor.

13     MS. NEWMAN:  I do not believe that there is any

14  commingled income with respect to his ex-wife.  In fact, I'm

15  pretty confident there is no commingling.

16     MS. BAUMANN:  There are commingled expenses, which I

17  think is just the concern to make sure -- obviously, Your

18  Honor, we wouldn't be taking into account his former wife's

19  income, but to the extent that they do have some sort of

20  shared expenses in the sense that he has credit cards in his

21  name that she does pay the bill for.

22     MS. NEWMAN:  Because there are expenses for the

23  children.

24     But I understand it's Probation's position, and it

25  is common in a fraud case for that to be a condition, so it's

1  a general condition that usually is included so I do not

2  object to it, but I -- and I am happy to hear that Probation

3  understands that the wife's income is the wife's income, et

4  cetera.  Whether he may then have a card which he pays because

5  it's the children's expenses, that can well be explained to

6  Probation and they would understand that it's -- you know the

7  distinction.  So that would be fine.

8           And I do want to put -- as my recollection, we had

9  sent to the AUSA here in the Eastern District -- I forgot her

10  name for the moment -- those forms, that lengthy form.

11           MS. GLASER DAUERMANN:  If that's the case, they

12  didn't reach me.  I appreciate you clarifying that.

13           MS. NEWMAN:  Okay.  If I have it, I can resend it.

14           THE COURT:  If it says in the Probation Report that

15  he completed a financial statement -- so that's something

16  different from what they owe you?

17           MS. BAUMANN:  No, the personal financial statement

18  that was submitted to us is separate from the financial

19  statement submitted to the Government.  I believe the

20  statement submitted to the Government is much lengthier than

21  the statement we have from the Defendant.

22           MS. NEWMAN:  It is much lengthier.  In the Eastern

23  District they do require this very lengthy, do you have boats,

24  do you have airplanes.

25           THE COURT:  And you think you've done that already?

1    MS. NEWMAN:  My recollection is he did that.  If

2  not, we will do it because we've agreed to do it.  By the way,

3  Your Honor, it is part of the plea agreement.

4         THE COURT:  Right.

5         MS. NEWMAN:  So we don't dispute the need to do it

6  and if we haven't and I confused it with another case, I

7  apologize and I will get that to you right away.

8         THE COURT:  All right.  I want to make sure that I

9  put what the conditions are for supervisory release, at least

10  in terms of financial disclosure:  That he will disclose all

11  employment of any kind; that he will disclose all accounts

12  that he has, bank accounts, credit card accounts; that he will

13  not open any new accounts without Probation's knowledge; and

14  that he will also be required to notify you of what his

15  employment is?

16         MS. BAUMANN:  Yes.

17         THE COURT:  What about income tax?

18         MS. BAUMANN:  Yes, income tax returns would

19  definitely be included on that.  If Your Honor would agree, I

20  can certainly provide our standard language after this

21  proceeding today to your courtroom deputy.

22         THE COURT:  Okay.  I just want to make sure -- I

23  think the Second Circuit is a little picky about this -- I

24  want to just make sure that it's on the record as well.  I

25  think I've got it all, I do this on a fairly regular basis and

1    I think we've got the sum and substance of it.  I don't see

2    this as a case where someone is going to go running and

3    complaining that I imposed a condition on them that they

4    weren't expecting, but I think I've got everything that you

5    need, but we'll put that in.  And by the way, obviously, in

6    the judgment if it has a condition that you hadn't anticipated

7    let me know and we'll fix it.  Okay?

8             MS. BAUMANN:  That's fine.  Thank you, Your Honor.

9             THE COURT:  All right.  Now --

10            MS. BAUMANN:  Your Honor, I'm sorry to interrupt.

11   If I could just make a suggestion?

12            THE COURT:  Sure.

13            MS. BAUMANN:  Which, of course, does not need to be

14   decided today, it could be decided at the time when the

15   restitution figure is imposed, just considering the household

16   financial situation, Your Honor doesn't necessarily have to

17   impose the 10 percent of his gross monthly income.  It could

18   be a certain figure that the parties and the Court agree upon.

19            THE COURT:  Okay.  And this is for restitution?

20            MS. BAUMANN:  That's correct, Your Honor.

21            THE COURT:  So I will say that I do not read -- and

22   everybody can correct me if I'm wrong, the plea agreement says

23   that the defendant is pleading guilty to Count One which, as

24   the Government explained, involves this one physical

25   therapist; correct so far?

1      MS. GLASER DAUERMANN:  Correct.

2      THE COURT:  And the plea agreement says that -- and

3  one of the penalties is that restitution is mandatory in the

4  full amount of each victim's losses as determined by the

5  Court.  I mean, is that what you're relying on?  Are you

6  saying they agreed to restitution?

7          I don't think you are, are you?

8      MS. GLASER DAUERMANN:  I'm not saying that we agreed

9  to an amount, but we would appreciate the opportunity to brief

10  the issue of --

11     THE COURT:  I think that's necessary because you

12  sent me a lot of tables, but I don't know what the calculation

13  is, I don't know -- I mean, I think Ms. Newman makes a fair

14  point that there hasn't been any discovery on it and I

15  believe, and correct me if I'm wrong, but does your

16  calculation involve -- is based on losses in one of the counts

17  to which he didn't plead?  I don't know if that's permitted.

18     MS. GLASER DAUERMANN:  So if I could just address

19  that for a moment, first the discovery issue.  In terms of

20  what the Government has with respect to restitution, we are

21  relying on the figures that were provided to us by the

22  insurance companies.

23     THE COURT:  But are they connected with the count to

24  which he pled guilty?  That's my question.

25     MS. GLASER DAUERMANN:  So what we have received from

1    the insurance companies is each of the companies has provided

2    us with the loss stemming from each of the eight different

3    clinics that were involved in the scheme.  We would appreciate

4    the opportunity to brief the MVRA issue, but in terms of what

5    the Government has, and would be able to make available for

6    discovery, essentially what we have is the numbers reported to

7    us by each of the -- either victim insurance companies.  Some

8    of them included a spreadsheet with claim level detail, some

9    of them did not.  We don't believe that that is necessary for

10   the Court to determine restitution because we believe that the

11   restitution ought to be determined at the clinic level; just

12   all of the claims from the clinic are fraudulent and require

13   restitution or they don't.

14          So, in terms of the numbers that we were provided

15   from the insurance companies, the only additional material

16   that we could turn over is the e-mails that they sent with the

17   numbers and then we could turn over that claim level detail,

18   but we do not believe that that is either necessary in this

19   situation or particularly appropriate in the context of a

20   restitution discussion.

21          THE COURT:  Okay.  Again, and I apologize if I am

22   being thick, but I don't understand to what extent these -- I

23   do agree that they have to be in connection to the count to

24   which he plead guilty, Count One.  Yes?

25          MS. GLASER DAUERMANN:  Yes.

1          THE COURT:  Okay.  I thought the conduct underlying

2   Count One was the one physical therapist; is that also

3   correct?

4          MS. GLASER DAUERMANN:  Your Honor, that's what we

5   would ask for the opportunity to brief.

6          THE COURT:  Okay.

7          MS. GLASER DAUERMANN:  But that's why we provided

8   the information on a clinic-level basis and I would state that

9   Clinic H from the restitution order is the clinic that was at

10  issue in the indictment.

11         THE COURT:  Okay.  I will say -- and I don't mean

12  this in a mean way -- I don't find those tables helpful at

13  all.  I don't know what they -- I mean, it's a bunch of

14  insurance companies with numbers after them, so whether it's

15  discovery or not, I mean, there has to be some kind

16  connection -- but I know you're going to brief it.

17         I'm sorry to give you a hard time about it, but it

18  just wasn't helpful.

19         MS. GLASER DAUERMANN:  No, that would be fine, Your

20  Honor.  And in terms of the tables themselves, that would not

21  be the subject of the briefing but essentially what the tables

22  are is each insurance company reported to the Government we

23  lost X amount money to Clinic A, Clinic B, et cetera, and so

24  we have provided each individualized information for each

25  insurance company as to how much they lost to each of the

1   clinics.

2           THE COURT:  Okay.  Now, the other question I ask is

3   that -- what about the question of apportioning liability?  I

4   mean, he's not the only -- is that going to be something you

5   will cover in your briefing?  He's not the only person, right?

6           MS. GLASER DAUERMANN:  We certainly can cover that,

7   but we will be asking the Court to impose joint and several

8   liability with the clinic owners and other members of the

9   conspiracy.

10          THE COURT:  And I don't know if you can answer this,

11  but are any of them being held responsible; the clinic owners

12  and all of that?  I don't have those cases, I think I have

13  only one other case.

14          MS. GLASER DAUERMANN:  I understand.  Some of the

15  clinic owners have been charged.

16          THE COURT:  And then the other thing I know -- maybe

17  this is not a thing, but do you ever take into account the

18  likelihood that a person could pay restitution in this amount?

19  I mean, it seems like something that they probably won't ever

20  recover.

21          MS. GLASER DAUERMANN:  Your Honor, it's tough for me

22  to speak to that.  My obligation --

23          THE COURT:  It's a practical consideration.

24          MS. GLASER DAUERMANN:  I completely understand that.

25  My obligation is to the victims to try to get them back their

1   money as much as I can.

2           THE COURT:  It's related to his conduct, right?

3           MS. GLASER DAUERMANN:  All of the money that's

4   referred to in the restitution order is related to his

5   conduct.

6           THE COURT:  But it all came from that Count One?

7           MS. GLASER DAUERMANN:  All of the clinics in the

8   restitution order were connected to the same overarching

9   scheme.

10          THE COURT:  I see.  Okay.

11          Ms. Newman, I know you have a lot to say about this,

12  but let me just say one thing:  I'm going to set a briefing

13  schedule on it and I do think --

14          Saying just give discovery on restitution, I guess

15  you should give them what you have.  I don't know how

16  Ms. Newman is supposed to respond if she doesn't -- I mean,

17  the evidence is what the evidence is.  If that's what she's

18  got, that's what I'll consider.  But I do think it's not

19  really an answer to say you don't have to give discovery.  I

20  just don't know how she's going to -- and maybe this is a

21  failure of imagination on my part, but I don't know how a

22  lawyer can respond to it or give advice to her client if she

23  doesn't know if that's all it's going to be.

24          MS. GLASER DAUERMANN:  Well, Your Honor, we believe

25  this is a purely legal issue.  We've never taken the position

1  that we would not provide discovery as to restitution.  I

2  believe that's been assumed, but we've never taken that

3  position.

4          THE COURT:  Okay.  So I guess the first thing to do

5  then is to set a schedule for when you're going to -- have you

6  turned it over already?

7          MS. GLASER DAUERMANN:  We wanted to clarify the

8  issues today before --

9          THE COURT:  Okay.  All right.

10          So, Ms. Newman, I guess -- I know sort of

11  substantively you have a lot to say about it.  For me, it's

12  probably easier if I get the briefing on it.  I certainly read

13  everybody's submissions and I think I understand the law on

14  this, but sometimes I think that and it turns out that I

15  don't.  But what I'm wondering is, in terms of discovery, a

16  reasonable discovery that will enable you to represent

17  Mr. Geykhman, what is it that you're looking for in terms of

18  discovery?

19          MS. NEWMAN:  So with other similar cases, I have

20  received from the Government the letters that were sent to the

21  insurance company, which in one case in particular turned out

22  to be an important issue, but to the letters sent requesting

23  the information and the breakdown of the spreadsheets, which

24  I've also gotten which they've indicated the amount paid, when

25  it was paid, et cetera, whether arbitration, for example.  So

1    the fact that A was charged but they received B was also on

2    the spreadsheets that I received in the past.

3           And I think it's important the Court has to know I

4    received zero discovery with respect to any other iteration,

5    as the Government likes to call it, and the only discovery we

6    received is as to Count One which is narrow in scope.  I

7    didn't draft it, it is what we have pled to.  So that's my

8    position and I would welcome the discovery because I have

9    none.

10          THE COURT:  Okay.  The other thing, I know this is

11   not civil case, I don't know to what extent you can sit down

12   and work out your differences on this, maybe you can and maybe

13   you can't, but maybe there's a set of facts that you can agree

14   on.  But what I think the best thing to do is probably for us

15   to set a briefing schedule, just keeping in mind that -- which

16   I know everybody knows -- that it's the Government's burden by

17   a preponderance in terms of the amount of restitution.  I'm

18   just trying to think what... in terms of time, I mean, the

19   statute requires that the date to determine all losses

20   shouldn't be more than 90 days after sentencing.

21          MS. NEWMAN:  That number can be enlarged.  That

22   being said, it doesn't matter.  I think it was two years

23   later, but I --

24          THE COURT:  That, I get, but, you know, if we can

25   resolve this within this time, you know, I'm a rule follower.

1        So, how much time -- you submit your briefing and

2   the defendant will respond and you can do a reply, is that --

3        MS. GLASER DAUERMANN:  We would appreciate that,

4   Your Honor.

5        THE COURT:  How much time would you need?

6        MS. GLASER DAUERMANN:  I would ask for three weeks

7   for the Government to submit.

8        THE COURT:  So where does that take us, Ms. Green?

9        THE COURTROOM DEPUTY:  May 3rd.

10        THE COURT:  So May 3rd for the Government.

11        How about you, Ms. Newman?

12        MS. NEWMAN:  I don't know how extensive the

13   discovery is and I have... and I'm going to be away and --

14        THE COURT:  How about the first week in June?

15        MS. NEWMAN:  That would be very helpful.  Thank you,

16   that would be great.

17        THE COURTROOM DEPUTY:  June 2nd.

18        THE COURT:  All right.  And then a reply two weeks

19   later?

20        MS. GLASER DAUERMANN:  At least.  I'm going to be on

21   trial all of June, so -- I'm not going to ask her to be past

22   June, but in that time --

23        THE COURT:  How about July?

24        MS. GLASER DAUERMANN:  I'm in back-to-back between

25   June and July -- you've got me in July.

1    THE COURT:  Yeah, me and Judge Seybert, I think.

2    MS. GLASER DAUERMANN:  Yes, definitely.

3    THE COURT:  Okay.  So --

4    THE COURTROOM DEPUTY:  June 16th, Judge?

5    THE COURT:  Is that okay for you?

6    MS. GLASER DAUERMANN:  I can make that work.  Thank

7  you, Judge.

8    THE COURT:  Okay.  All right.

9    Now, in terms of discovery, when do you think you

10  can get discovery to Ms. Newman?

11    MS. GLASER DAUERMANN:  So it depends on what Your

12  Honor believes is appropriate to turn over.  Our position is

13  that there is no place here for kind of taking on the

14  individual claims and saying, well, this claim was affected by

15  this and this one wasn't.  Either the entire clinic was

16  subject to fraud and every single claim that came from the

17  clinic was fraud or it wasn't.  There are no claims that are

18  going to be at all substantively different from any other

19  claim, so --

20    THE COURT:  Again, not to -- maybe it's a dumb

21  question, but it's your position that there are no claims from

22  these clinics that would be legitimate; correct?

23    MS. GLASER DAUERMANN:  That's correct.

24    MS. NEWMAN:  Your Honor, if I might?

25    THE COURT:  You still have the burden of proof by a

1   preponderance --

2          Go ahead.

3          MS. NEWMAN:  How would I know that?  I have no

4   discovery as to that and I don't agree with them because from

5   what I could tell from the little snippet of that late

6   discovery, that indeed some of the clinics commingled; in

7   other words, they had legitimate physical therapist practice,

8   I think, and then they commingled this with their other

9   monies.  I just don't know.  I've had none of the discovery as

10  to any of the other clinics which, as you know, my position is

11  they don't apply anyway.

12         THE COURT:  Well, I think it's sort of a -- it's

13  sort of a combination of two things.  You've got the burden by

14  a preponderance, and obviously you're going to have to

15  persuade me, so I think you have to give counsel the

16  information that you have that forms the basis for your belief

17  that you've met the burden.  It's hard for me to say what it

18  is, I don't know what it is.  I don't know what you've got,

19  but you are good lawyers.  I think Ms. Newman could give you a

20  list of things she's looking for.  It might be a place to

21  start.  I just don't know.  I took the plea in the case, but I

22  don't know the ins and outs of the case.

23         MS. GLASER DAUERMANN:  I understand.  And just to

24  clarify, I'm not sure why Ms. Newman thinks that there were

25  legitimate physical therapists.  It is the Government's

1  position that every claim that was reported to the insurance

2  companies from each of these clinics were fraudulent and --

3          THE COURT:  Is it your position that they were

4  opened for the purpose of -- that the clinics were opened for

5  the purpose of, you know, making these fraudulent claims?

6          MS. GLASER DAUERMANN:  Either opened or resurrected

7  from dormancy, yes, Your Honor.

8          THE COURT:  All right.  Well, that will be part of

9  the evidence of the case and she's entitled to it.  Okay?

10          MS. NEWMAN:  But just so the record is clear, it is

11  our position that none of that is relevant because -- except

12  as to Count One, which I do admit we do have records as to

13  Count One.

14          THE COURT:  Okay.

15          MS. NEWMAN:  So as to that I'm not questioning Count

16  One, it's a little over a million dollars, and we have the

17  records for that and we agree on the amount, it's just a

18  mathematical calculation.

19          THE COURT:  Yes, that is true.  I didn't mean to get

20  away from this -- sort of the more broad question is, what

21  exactly -- when someone pleads guilty to one count, what can

22  the restitution order encompass?  The Circuit, at least in the

23  90s, said simply agreeing to make full restitution for loss

24  suffered -- which I don't even know is in the plea

25  agreement -- does not mean that the defendant agrees to pay

1   for any losses that exceeded those caused by the offense of

2   conviction.  So maybe there is something that's happened more

3   recently than that.  Like I said, that's why we're briefing

4   it.

5           All right, so I think we've done all of that.

6   Anything that I've forgotten to do or that anybody else wants

7   to raise?

8           MS. GLASER DAUERMANN:  Your Honor, just if you would

9   not mind, for the record, stating the amount of forfeiture you

10  are imposing.

11          THE COURT:  Yes.  So in January I signed the

12  restitution order which was in the amount of $180,000.  There

13  is no dispute about the amount; correct?

14          MS. NEWMAN:  No.

15          THE COURT:  All right.  Anything else that we need

16  to do?

17          MS. GLASER DAUERMANN:  I may just not have heard

18  this, but I moved to dismiss Count Two.  I'm not sure whether

19  Your Honor granted the motion.

20          THE COURT:  I think I did, but if I didn't, I'm

21  doing it now.

22          MS. GLASER DAUERMANN:  Thank you, Your Honor.

23          THE COURT:  Anything else anybody wants to say?

24          MS. GLASER DAUERMANN:  Nothing further from the

25  Government.  Thank you.

1          MS. NEWMAN:  Nothing from the defense.  Thank you

2    very much, Your Honor.

3          THE COURT:  Mr. Geykhman, I do wish you and your

4    family the best, okay?

5          THE DEFENDANT:  Thank you, Your Honor.

6

7          (Matter adjourned.)

8                          - ooOoo -

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25